UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES LEE HILL, JR.,

     Applicant,

v.                                  CASE NO. 8:18-cv-1446-SDM-TGW

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

Hill applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 10) and challenges his convictions for first-degree murder, armed kidnapping, and robbery with a firearm. Hill is imprisoned for life. Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 12) The respondent concedes that the application is timely but argues that some grounds are unexhausted and procedurally defaulted. (Doc. 11)

## **I. BACKGROUND**[1]

James Brotherton, a bus driver for Sarasota County Area Transit, was robbed and murdered. Brotherton's shift ran from 5:00 a.m. to 2:30 p.m. (Respondent's Exhibit 18 at 1232–33) Because he lived an hour away in Port Charlotte, Brotherton often slept in his car by the Sarasota bus depot. (Respondent's Exhibit 18 at 1167,

---

[1] This summary of the facts derives from the trial transcript. (Respondent's Exhibit 18)

1677–79)  Around 12:30 a.m. on November 22, 2011, law enforcement discovered Brotherton's lifeless body outside a public library in Sarasota.  (Respondent's Exhibit 18 at 1078–79)  He had died of a single gunshot wound to the back.  (Respondent's Exhibit 18 at 1539)  A surveillance camera captured the shooting, which took place at 11:54 p.m.  (Respondent's Exhibit 18 at 1288–90)  The footage was too "low resolution" to identify the shooter.  (Respondent's Exhibit 18 at 1290–91)

Ten minutes before the shooting, surveillance footage showed Brotherton parking his car at a nearby bank.  (Respondent's Exhibit 18 at 136–37)  A man later identified as Hill sat in the back.  (Respondent's Exhibit 18 at 136–37, 539–42)  The two men got out, and Brotherton approached an ATM with Hill directly behind him.  (Respondent's Exhibit 18 at 1159–60)  Brotherton inserted his card into the ATM and requested a balance inquiry, which showed "no money in [the] account."  (Respondent's Exhibit 18 at 1152–53)  The two men walked back to the car, and Brotherton drove off.  (Respondent's Exhibit 18 at 1159–60)

One week after the shooting, law enforcement released the ATM footage to the public.  (Respondent's Exhibit 18 at 1161, 1206)  Rick Rowland saw the footage, contacted law enforcement, and identified Hill as the perpetrator.  (Respondent's Exhibit 18 at 1372, 1374)  Rowland was a friend of Hill's who occasionally helped him with construction jobs.  (Respondent's Exhibit 18 at 1314–15)

On the evening of the shooting, Rowland picked up Hill at his house.  (Respondent's Exhibit 18 at 1318–19)  They bought and consumed oxycodone.  (Respondent's Exhibit 18 at 1328–30)  Hill said he was looking for a "guy [who]

owed him money." (Respondent's Exhibit 18 at 1330) The two drove "aimless[ly]" in search of the man; they never found him. (Respondent's Exhibit 18 at 1330–31, 1336) While they were stopped at an intersection, Hill "smiled," said "he would be right back," and got out of the car, leaving his cell phone behind. (Respondent's Exhibit 18 at 1337, 1343) Hill instructed Rowland to park at a nearby bar. (Respondent's Exhibit 18 at 1337)

Approximately one hour later, at 12:17 a.m., Rowland received a call from "an out-of-state number" that he did not recognize. (Respondent's Exhibit 18 at 1343, 1348) Hill was the caller. (Respondent's Exhibit 18 at 1343) He said he "need[ed] a ride" and asked Rowland to pick him up at a nearby Burger King. (Respondent's Exhibit 18 at 1351) Law enforcement later traced the out-of-state number to Jamie Wilson, a woman who lived in Sarasota with a roommate, Tiffani Singletary. (Respondent's Exhibit 18 at 1473–75) Their house was a fifteen-minute walk from the scene of the shooting. (Respondent's Exhibit 18 at 1171-72) Both women testified that, shortly after midnight on November 22, a man approached them on their front porch and asked to borrow a cell phone. (Respondent's Exhibit 18 at 1474, 1496) Wilson agreed to lend the man her phone. (Respondent's Exhibit 18 at 1497) When the call ended, the man gave Wilson a dollar bill and walked away. (Respondent's Exhibit 18 at 1498–99) Both women identified Hill as the man who borrowed the phone. (Respondent's Exhibit 18 at 1478, 1500)

Shortly after the call, Rowland picked up Hill at the Burger King. (Respondent's Exhibit 18 at 1351–52) Hill began to talk about "how he killed some

guy." (Respondent's Exhibit 18 at 1352) He said, "I shot him in the f*cking back." (Respondent's Exhibit 18 at 1352) Asked to elaborate, Hill explained that he "told the guy to get in the trunk," but "[t]he guy started running, and he shot him." (Respondent's Exhibit 18 at 1352–53, 1364)

Law enforcement recovered a ".38-caliber class bullet" from the scene of the shooting. (Respondent's Exhibit 18 at 1522) During a search of Hill's residence, law enforcement found a "smashed" .38 caliber revolver in a garbage can. (Respondent's Exhibit 18 at 1523–24) The revolver had been broken into four pieces and placed in separate plastic bags. (Respondent's Exhibit 18 at 1665–66, 1708) The revolver was "so badly damaged" that law enforcement could not determine whether the revolver was the murder weapon. (Respondent's Exhibit 18 at 1524) But the bullet that killed Brotherton could have been fired from the revolver. (Respondent's Exhibit 18 at 1523)

Law enforcement found Brotherton's car less than two miles from the scene of the shooting. (Respondent's Exhibit 18 at 1146–47) His wallet was never recovered. (Respondent's Exhibit 18 at 1143–44, 1686) Hill left neither DNA nor fingerprints on the car. (Respondent's Exhibit 18 at 1725–26, 1746)

Hill was charged with first-degree murder, armed kidnapping, and robbery with a firearm. (Respondent's Exhibit 18 at 15–17, 45–46) At trial, Hill testified in his defense and claimed that he was home when the robbery and shooting took place. (Respondent's Exhibit 18 at 1944–46, 1973–74) The jury found Hill guilty as charged. (Respondent's Exhibit 2) Hill's sentence was three consecutive terms of life

imprisonment. (Respondent's Exhibit 4 at 3)  The appellate court affirmed the convictions without a written opinion. (Respondent's Exhibit 7)  Hill unsuccessfully moved for post-conviction relief under Florida Rule of Criminal Procedure 3.850. (Respondent's Exhibits 8–9, 11, 16)  This federal habeas application followed. (Docs. 1, 10)

## II. EXHAUSTION AND PROCEDURAL BAR

The respondent argues that grounds three through five and seven through nine are barred from federal review because Hill failed to exhaust his state court remedies. (Doc. 11 at 13–16, 18–19, 23, 25, 27)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *accord Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error.").  An applicant must present to the federal court the same claim presented to the state court.  *See Picard*, 404 U.S. at 275 ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.").  "Mere similarity of claims is insufficient to exhaust." *Henry*, 513 U.S. at 366.

As *Baldwin v. Reese*, 541 U.S. 27, 32 (2004), explains, an applicant must alert the state court that he is raising a federal claim and not just a state law claim:

> A litigant wishing to raise a federal issue can easily
> indicate the federal law basis for his claim in a state court
> petition or brief, for example, by citing in conjunction with
> the claim the federal source of law on which he relies or a
> case deciding such a claim on federal grounds, or by
> simply labeling the claim "federal."

"It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Consequently, "a petitioner with a claim that could arise under state or federal law must clearly indicate to the state courts that he intends to bring a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458 (11th Cir. 2015).

**Grounds Three, Four, Seven, Eight, and Nine:**

In these grounds, Hill alleges that trial counsel provided ineffective assistance in various respects. (Doc. 10 at 22, 28, 49, 52, 56) The respondent argues that Hill failed to alert the state courts to the federal nature of his claims. (Doc. 11 at 13, 16, 23, 25, 27) The respondent is mistaken. Hill raised each assertion of ineffective assistance in his Rule 3.850 motion and argued that counsel's conduct violated his "6th and 14th Amendment rights to effective counsel." (Respondent's Exhibit 8 at 1, 13, 18, 23, 27) The post-conviction court denied relief. (Respondent's Exhibits 9, 11) On appeal, Hill argued that the post-conviction court "erred in denying his claims" and that counsel's "ineffective assistance caused his 6th and 14th Amendment rights to be violated, in accordance with the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." (Respondent's Exhibit 14 at 12)

Because Hill fairly presented his federal claims to the state courts, grounds three, four, seven, eight, and nine are exhausted.

**Ground Five:**

In ground five, Hill argues that the trial court violated his right to due process by allowing the prosecution to present evidence that he resisted arrest. (Doc. 10 at 41) Hill raised similar allegations on direct appeal, but he failed to make the state court aware that he intended to assert a federal claim. Hill did not argue that the trial court's alleged error violated any federal right. Nor did he cite any provision of the federal constitution. Instead, Hill relied solely on Florida law to argue that the trial court "erred in admitting evidence of [his] alleged resistance to a lawful arrest for purposes of demonstrating 'consciousness of guilt.'" (Respondent's Exhibit 4 at 4, 7–14)

Because Hill did not "fairly present" his federal claim to the state court, ground five is unexhausted. *See Baldwin*, 541 U.S. at 27; *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1352 (11th Cir. 2012) ("In other words, 'to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'") (quoting *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007)). Therefore, ground five is barred from federal review absent a showing of "actual cause and prejudice" or a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we

can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").

The basis for "cause" must ordinarily reside in something external to the defense. *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995). To show "prejudice," the applicant must establish "not merely that the errors . . . created the *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). A fundamental miscarriage of justice occurs only if a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *House v. Bell*, 547 U.S. 518, 536–37 (2006).

Hill fails to establish either cause and prejudice or a fundamental miscarriage of justice. Consequently, ground five is procedurally barred from federal review. Hill's remaining grounds are exhausted and entitled to a review on the merits.

### III. MERITS

**Standard of Review:**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998). Section 2254(d), which creates a highly deferential standard for federal court review of a state-court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

was adjudicated on the merits in State court proceedings
unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of,
> clearly established Federal law, as determined
> by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power
> of a federal habeas court to grant a state prisoner's
> application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court.  Under §
> 2254(d)(1), the writ may issue only if one of the following
> two conditions is satisfied — the state court adjudication
> resulted in a decision that (1) "was contrary to . . . clearly
> established Federal law, as determined by the Supreme
> Court of the United States" or (2) "involved an
> unreasonable application of . . . clearly established Federal
> law, as determined by the Supreme Court of the United
> States."  Under the "contrary to" clause, a federal habeas
> court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established

federal law is objectively unreasonable[;] . . . an unreasonable application is different

from an incorrect one."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  "As a condition for

obtaining habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question . . . ."); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable application of ' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419); *accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694.  A federal court must afford due deference to a state court's decision.  "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult

to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

In *per curiam* decisions without written opinions, the appellate court affirmed Hill's convictions and affirmed the denial of his Rule 3.850 motion. The appellate court's *per curiam* decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), *and Bishop v. Warden*, 726 F.3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or

"ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state-court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

Hill bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

**Ineffective Assistance of Counsel:**

Hill claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.

1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Hill must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Hill must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Hill cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *See Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

### **Ground One:**

Hill argues that the trial court erred in denying his motion to suppress the identifications by Jamie Wilson and Tiffani Singletary. (Doc. 10 at 7–9) Wilson and Singletary identified Hill as the man who approached them shortly after the shooting and asked to borrow a cell phone. (Respondent's Exhibit 18 at 1478, 1500) During the encounter, the two women sat on a front porch illuminated by a "porch light." (Respondent's Exhibit 18 at 914–15) Wilson was "somewhat suspicious" of the man, and she kept her "hand on the doorknob" in case she had to "go inside." (Respondent's Exhibit 18 at 916) When the man approached to take the phone, Wilson saw his "entire face." (Respondent's Exhibit 18 at 917) Singletary likewise had a "clear view" of his face. (Respondent's Exhibit 18 at 957–58) They saw his face again when he returned the phone. (Respondent's Exhibit 18 at 919) The encounter lasted approximately five minutes. (Respondent's Exhibit 18 at 921)

Eleven days later, law enforcement separately interviewed Wilson and Singletary. (Respondent's Exhibit 18 at 6–7, 30) A detective showed Wilson a driver's license photograph of Hill and asked, "Is this the person that used your

phone?" (Respondent's Exhibit 18 at 900)  She "immediate[ly]" responded, "Yes, no

question." (Respondent's Exhibit 18 at 901)  Wilson gave no "physical description"

but claimed the man wore a "hoodie sweatshirt" and "shorts." (Respondent's

Exhibit 18 at 903)

A different detective interviewed Singletary.  (Respondent's Exhibit 18 at 939)

He showed her a still from the ATM footage.  (Respondent's Exhibit 18 at 943)  The

photograph "wasn't clear enough for her" to make an identification.  (Respondent's

Exhibit 18 at 943)  The detective showed her Hill's driver's license photograph.

(Respondent's Exhibit 18 at 943)  She was "[v]ery certain" Hill was the man who

asked to borrow a cell phone.  (Respondent's Exhibit 18 at 943)  She described him

as about 5'6" or 5'7" and claimed he wore "blue jeans," a t-shirt, and a jacket.

(Respondent's Exhibit 18 at 965–66)  Hill is 5'11".  (Respondent's Exhibit 18 at 988)

Hill moved to suppress the identifications.  (Respondent's Exhibit 18 at 513)

He argued that law enforcement used "procedures that were so unnecessarily

suggestive that they [gave] rise to a substantial likelihood of irreparable

misidentification." (Respondent's Exhibit 18 at 513)  Following an evidentiary

hearing, the trial court denied the motion to suppress.  (Respondent's Exhibit 18

at 1026)  The court agreed that "just put[ting] the photograph out there" was unduly

suggestive.  (Respondent's Exhibit 18 at 1026)  The court concluded, however, that

law enforcement did not "in any way change[ ] [the women's] ability to identify"

Hill.  (Respondent's Exhibit 18 at 1026)  According to the court, the women's

"interaction" with Hill "registered in both of their minds," and their "recollection

was not tampered with in any way by any action that law enforcement took." (Respondent's Exhibit 18 at 1026)

Hill challenged this ruling on direct appeal, and the appellate court rejected his argument without explanation. (Respondent's Exhibit 4 at 14–25; Respondent's Exhibit 7) Consequently, Hill must show that "no fairminded jurist could agree" with the denial of his motion to suppress. *King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023). "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." *Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011).

Hill cannot meet his burden. The constitution imposes "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "Out-of-court identifications are examined for due process violations using a two-part test: The court must first decide whether the [procedure] was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification." *United States v. Smith*, 459 F.3d 1276, 1294 (11th Cir. 2006). Undue suggestion does not require exclusion of the resulting identification if, "under the totality of the circumstances, the identification was nonetheless reliable." *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).

Even if the identification procedure in this case was unduly suggestive, Hill is entitled to no relief because the state court reasonably concluded that the identifications were nonetheless reliable. "Factors to be considered in determining whether the identification was reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of the description; (4) level of certainty; and (5) length of time between the [encounter] and the identification." *Diaz*, 248 F.3d at 1102 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). "The determination of whether an identification procedure violates due process is governed by an extraordinarily general standard that hews closely to the facts of a particular case and turns on a court's judgment in evaluating those facts." *Brisco v. Ercole*, 565 F.3d 80, 90 (2d Cir. 2009). Therefore, a state court is "entitled to significant leeway when [a federal court] review[s] its decision for reasonableness." *Brisco*, 565 F.3d at 90.

Wilson and Singletary had ample "opportunity . . . to view" the man who borrowed Wilson's cell phone. *Biggers*, 409 U.S. at 199. The encounter lasted approximately five minutes, and both women had an unobstructed view of the man's face when he retrieved and returned the phone. (Respondent's Exhibit 18 at 917, 919, 921, 957–58) Wilson likely paid a high "degree of attention" because she was suspicious of the man. *Biggers*, 409 U.S. at 199; *see also United States v. Hammond*, 666 F.2d 435, 440 (9th Cir. 1982) (witness likely paid high degree of attention because suspect "generally acted in . . . a suspicious manner" during encounter). Singletary likewise testified that she was "paying attention" to the man's face during the incident. (Respondent's Exhibit 18 at 971–72) Moreover, both women displayed a

high "level of certainty" when they identified Hill. *Biggers*, 409 U.S. at 199. And the identifications took place only eleven days after the encounter — "well within the outer limit of acceptable intervals." *Dooley v. Duckworth*, 832 F.2d 445, 450 (7th Cir. 1987) (eleven days between crime and identification). To be sure, the women gave conflicting descriptions of the man's clothing, and Singletary underestimated Hill's height. But a reasonable jurist could conclude that, "under the totality of the circumstances, the identification[s] [were] nonetheless reliable." *Diaz*, 248 F.3d at 1102. Thus, "federal habeas relief must be denied." *Hill*, 662 F.3d at 1346.

**Ground Two:**

Hill faults trial counsel for failing to hire an expert on "eyewitness identification." (Doc. 10 at 17) According to Hill, after the motion to suppress was denied, counsel "should have continued defending him from [Wilson and Singletary's] unreliable identifications by consulting with and obtaining an eyewitness identification expert to scientifically scrutinize the reliability of the identifications." (Doc. 10 at 18) This expert allegedly would have highlighted "the suggestive procedures employed by law enforcement . . . , conflicting and inaccurate descriptions, lack of attention, minimal lighting, [and] briefness of the encounter." (Doc. 10 at 18)

The post-conviction court rejected this claim. (Respondent's Exhibit 9 at 5) The court acknowledged that counsel "can be deemed deficient for failing to retain an eyewitness identification expert where an eyewitness's identification in a case will require any special knowledge in order for a jury to form its conclusions and . . .

expert testimony would assist the jury in understanding the evidence." (Respondent's Exhibit 9 at 5)  For example, an expert may be necessary to explain "technical and unintuitive identification issues," including "cross-racial identifications, unconscious transference, and a witness's focus on a weapon." (Respondent's Exhibit 9 at 5)  In this case, however, Hill challenged "the eyewitness identifications offered by Wilson and Singletary on grounds that [did] not require such special knowledge as to warrant expert testimony on the matters, as evidenced by counsel's zealous and effective cross-examination of Wilson and Singletary on these very issues."  (Respondent's Exhibit 9 at 5)  Therefore, the court held that counsel was not deficient for failing to hire an expert.  (Respondent's Exhibit 9 at 5)

This ruling was reasonable.  "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative."  *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).  "[E]vidence presented in post-conviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury."  *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014) (quoting *Holsey v. Warden*, 694 F.3d 1230, 1260–61 (11th Cir. 2012)).

Even without an expert, counsel vigorously challenged the reliability of Wilson and Singletary's identifications.  As the post-conviction court explained, counsel cross-examined both women about their identifications.  (Respondent's

Exhibit 18 at 1481–93, 1501–08)  During closing argument, counsel maintained (1) that law enforcement violated "proper procedure" by showing them only a single photograph, (2) that the only light source during the encounter was a "small light above the porch," (3) that the women offered "conflict[ing]" descriptions of the suspect, (4) that Singletary was not paying attention because she claimed she was "tired" after "get[ting] off work," (5) that the women did not see the suspect long enough to "mak[e] an identification in the dark," and (6) that there were "serious problems with" their "testimony."  (Respondent's Exhibit 18 at 2132–40)  "The likelihood of mistaken identification . . . was brought to the jury's full attention through" counsel's efforts.  *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985).  Thus, a reasonable jurist could conclude that counsel was not deficient because expert testimony would have merely told "a more detailed version of the same story told at trial."  *Tanzi*, 772 F.3d at 660.

## **Ground Three:**

Hill contends that counsel provided ineffective assistance by failing to hire an expert on "facial identification."  (Doc. 10 at 22)  As noted above, the jury viewed surveillance footage showing Brotherton and a man at an ATM ten minutes before the shooting.  (Respondent's Exhibit 18 at 136–37)  Rowland testified that he recognized Hill as the man in the footage.  (Respondent's Exhibit 18 at 1372)  Also, Hill's next-door neighbor recognized him by his "clothing" and "mannerisms" — "the way that he stood and shifted his weight and kind of swayed."  (Respondent's Exhibit 18 at 1563)  Hill contends that counsel should have retained an expert "to

explain physical differences between [him] and the suspect and to demonstrate that the quality of the images [was] too poor to make a reliable identification." (Doc. 10 at 23)

The post-conviction court correctly rejected this claim for lack of prejudice. (Respondent's Exhibit 9 at 4) Hill never identified any expert who could have provided the testimony he describes. Nor did he show that any expert "had actually reviewed the evidence in his case." *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016). "Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [Hill's] claims [was] mere speculation and [did] not entitle him to [ ] relief." *Finch*, 643 F. App'x at 852. Thus, the post-conviction court reasonably found no prejudice. *See, e.g.*, *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (state court reasonably rejected ineffective assistance claim based on failure to retain expert because "[i]t [was] speculative that an expert witness would in fact have testified" favorably to the defense); *Jimenez v. Sec'y, Dep't of Corr.*, No. 8:19-cv-684-MSS-AEP, 2021 WL 5416150, at *9 (M.D. Fla. Nov. 19, 2021) ("[I]n his post-conviction motion, [petitioner] neither identified an expert who could have testified [favorably to the defense] nor presented an affidavit or testimony to substantiate that testimony. Because [petitioner's] ineffective assistance of counsel claim was speculative, the state court did not unreasonably deny the claim.").

**Ground Four:**

Hill faults trial counsel for opening the door during cross-examination of Rowland to evidence of uncharged crimes. (Doc. 10 at 28)  Rowland told law enforcement that, two days after the shooting, Hill "went out trying to commit other robberies." (Doc. 10 at 29)  Before trial, the prosecution agreed not to elicit testimony about additional robberies. (Respondent's Exhibit 18 at 1432–33)  During cross-examination, counsel asked Rowland to describe what he and Hill did two days after the shooting. (Respondent's Exhibit 18 at 1432)  Rowland responded, "He told me we were going to do a solar panel job.  As soon as I get in the car and he drives crazy, he points to the back seat, and I'm like, what the hell is that.  He's like, it's a BB gun[.]" (Respondent's Exhibit 18 at 1432)  Counsel asked whether the two went "to work that day." (Respondent's Exhibit 18 at 1432)  Rowland said, "He was going out trying to rob people.  Just putting it out there." (Respondent's Exhibit 18 at 1432)  Counsel objected, the prosecution argued that counsel had opened the door, and the court overruled the objection. (Respondent's Exhibit 18 at 1432–33)

Hill argues that counsel was deficient for eliciting testimony that "impermissibly damag[ed]" his "credibility." (Doc. 10 at 29)  The post-conviction court found that Hill suffered no prejudice. (Respondent's Exhibit 11 at 3)  According to the court, "Rowland's statement was one of many that served to undermine the credibility of [Hill] and his version of events." (Respondent's Exhibit 11 at 2)  For example, Hill claimed that he was home by "approximately 8:30 p.m." on the night of the murder. (Respondent's Exhibit 11 at 2)  But "two witnesses

- 23 -

testified that [Hill] appeared at their home — located near the scene of the crime —

at 12:18 a.m. on [the night in question]." (Respondent's Exhibit 11 at 2) This

encounter took place "approximately 30 minutes after the victim was killed."

(Respondent's Exhibit 11 at 2) Furthermore, the prosecution did not "revisit[ ],

argue[ ], or allude[ ] to" any additional robberies "at any other point in [Hill's] trial."

(Respondent's Exhibit 11 at 2)

Also, the court pointed to "other evidence" of Hill's guilt. (Respondent's

Exhibit 11 at 3) Specifically, Hill's next-door neighbor "identif[ied] [him] as the

person seen behind the victim in ATM security footage recorded shortly before the

victim was killed"; "a .38 caliber projectile was recovered from the scene of the

victim's killing"; and "a dismantled, destroyed .38 caliber Colt revolver was

recovered from [Hill's] trash." (Respondent's Exhibit 11 at 2–3) Thus, the court

held that, "[b]ecause Rowland's contested statement was not otherwise referenced

[by the prosecution] during trial, was not the only matter undermining [Hill's]

credibility, and in light of the other evidence presented at trial," "no reasonable

probability [existed] that but for counsel's actions in opening the door to this

statement, the outcome of the trial would have been different." (Respondent's

Exhibit 11 at 3)

The post-conviction court reasonably found no prejudice. "The prejudice

prong requires the petitioner to establish a reasonable probability that, but for

counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla.

Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the

[petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [the federal district court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice petitioner — that there was no substantial likelihood of a different result — was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Hill cannot meet this demanding standard. As the post-conviction court explained, Rowland's statement was only "one of many that served to undermine the credibility of [Hill] and his version of events." (Respondent's Exhibit 11 at 2) Moreover, the prosecution did not contend that the jury should disbelieve Hill because he allegedly tried to commit additional robberies after the murder. Indeed, defense counsel argued in closing that Rowland fabricated the incident "to cast more suspicion on [Hill] . . . and away from himself." (Respondent's Exhibit 18 at 2101) Even apart from Rowland's statement, the prosecution presented an abundance of evidence of Hill's guilt. *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice"). Lastly, the trial court instructed the jury that Hill was "only on trial for the crimes charged in the state's charging documents and [was] not on trial for any other alleged crimes that may

- 25 -

have been referred to during the course of the trial." (Respondent's Exhibit 18 at 2195) Those uncharged crimes, the court explained, "should not be considered during deliberations." (Respondent's Exhibit 18 at 2195) "[A] jury is presumed to follow its instructions." *Evans v. Michigan*, 568 U.S. 313, 328 (2013). Because "some fairminded jurists could agree with the state court's" prejudice ruling, "federal habeas relief must be denied." *Hill*, 662 F.3d at 1346.

### Ground Six:

Hill contends that trial counsel was deficient for eliciting a prior inconsistent statement during cross-examination of Rowland. (Doc. 10 at 45) During direct examination, Rowland testified that on the night of the murder, Hill said he had "shot [a man] in the f*cking back." (Respondent's Exhibit 18 at 1352) During cross-examination, counsel got Rowland to admit that he told a different story when he first spoke to law enforcement. Specifically, Rowland told law enforcement that Hill "didn't tell me that night he killed someone[;] it was the day he picked me up in his mom's car." (Respondent's Exhibit 18 at 1434) Counsel asked whether Rowland told law enforcement that Hill said "he freaking shot two people and killed one of them." (Respondent's Exhibit 18 at 1434) Rowland agreed that he "might have said that." (Respondent's Exhibit 18 at 1434) Hill contends that counsel should have not elicited prior inconsistent statements about "other alleged shootings because they were irrelevant . . . and impermissibly damaged his character and credibility." (Doc. 10 at 45)

The post-conviction court rejected this claim for lack of prejudice. (Respondent's Exhibit 9 at 12)  The court explained that "[t]he thrust of counsel's questioning on this issue, and during cross-examination generally, was to undermine the credibility of *any* account offered by Rowland prior to or during trial." (Respondent's Exhibit 9 at 11)  According to the court, "[t]he prior inconsistent statement, if assumed to be accurate, would certainly imply that [Hill] committed an additional, uncharged crime by shooting someone other than the victim, but it would also serve to undermine the reliability of Rowland's trial testimony."  (Respondent's Exhibit 9 at 11–12)  Furthermore, the prosecution "did not argue or imply any additional shootings at any point during trial, and counsel's brief impeachment was the sole mention of the issue."  (Respondent's Exhibit 9 at 12)  Thus, because "the statement was relevant to impeaching Rowland's version of events, and . . . was not otherwise addressed at trial, it [was] unlikely that exclusion of the statement would have had any material impact on the outcome of [Hill's] trial."  (Respondent's Exhibit 9 at 12)

This ruling was reasonable.  Rowland was an important witness for the prosecution.  At trial, Rowland claimed that Hill admitted to shooting somebody on the night of the murder.  (Respondent's Exhibit 18 at 1352)  No other witness directly implicated Hill in the shooting.  Thus, Rowland's credibility was crucial. "One of the most effective means of attacking that credibility was to impeach him with prior inconsistent statements on key elements of his testimony."  *United States v. Hibler*, 463 F.2d 455, 462 (9th Cir. 1972).  Counsel impeached Rowland by

establishing that he offered two different versions of Hill's alleged confession. Defense counsel used this impeachment in closing when she urged the jury to "consider [Rowland's] inconsistent statements in judging his credibility." (Respondent's Exhibit 18 at 2104)  Moreover, as the post-conviction court noted, the prosecution "did not argue or imply any additional shootings at any point during trial."  (Respondent's Exhibit 9 at 12)  A fairminded jurist could conclude that counsel advanced Hill's defense by impeaching Rowland with his conflicting statements.  Therefore, the post-conviction court reasonably found that Hill suffered no prejudice.

**Ground Seven:**

Hill faults trial counsel for not objecting when his next-door neighbor identified him as the man in the ATM footage.  (Doc. 10 at 49)  Before trial, the court ruled that the neighbor could make the identification "to the extent that the proper predicate [was] laid."  (Respondent's Exhibit 18 at 451)  Hill argues that the proper predicate was not laid because the neighbor identified him only after "several opportunities to view the ATM video and the still photos of the suspect."  (Doc. 10 at 50)

The post-conviction court rejected this claim.  (Respondent's Exhibit 9 at 8)  The court explained that under Florida law, a "lay witness" may "give an opinion on the identity of [a] depicted individual" if he "has a special familiarity with the defendant beyond what a juror could conclude independently, and that familiarity places the witness in a better position than the jurors to identify the individual in

[the] recording." (Respondent's Exhibit 9 at 7–8)  As the court pointed out, Hill's neighbor testified (1) that "the outfit worn by the suspect in the ATM video was strikingly similar to the outfit that he regularly observed [Hill] wearing," and (2) that he noticed Hill's "'distinct' stance and the way he shifted his weight." (Respondent's Exhibit 9 at 8)  Thus, the court held that counsel was not deficient for failing to object because "the identification was based on special familiarity." (Respondent's Exhibit 9 at 8)

The rejection of this claim was reasonable.  "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017).  The post-conviction court found that, as a matter of Florida law, any objection would have failed because the neighbor's identification met the "special familiarity" standard. (Respondent's Exhibit 9 at 8)  Therefore, the post-conviction court "already has told us how the issue[ ] would have been resolved under Florida state law had [counsel] done what [Hill] argues [she] should have done." *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005).

Because the post-conviction court "authoritatively decided as a matter of [Florida] law" that any objection to the identification would have failed, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024).  "A lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008).

As a result, the post-conviction court reasonably concluded that counsel was not deficient for failing to raise Hill's meritless objection. *See Crum v. Crews*, No. 3:11-cv-480-RV-CJK, 2013 WL 4780129, at *30 (N.D. Fla. Sept. 5, 2013) ("Since the state courts have already ruled as a matter of state law that the evidentiary objection would have been properly overruled, that binding determination of state law means there cannot be attorney error or prejudice for failing to argue the objection.").

### Ground Eight:

Hill argues that trial counsel rendered ineffective assistance by failing to object to "inadmissible hearsay" from Hill's next-door neighbor. (Doc. 10 at 52–53)  The neighbor testified about a conversation he had with Hill approximately a week after the shooting.  (Respondent's Exhibit 18 at 1565–66)  According to the neighbor, Hill said that "the economy was getting so bad he couldn't feed his family, that his wife was pregnant and he had no money[,] that he knew people from work that would rob and steal and sell drugs, and that maybe it was time for him to start doing th[e] same — making the easy money." (Respondent's Exhibit 18 at 1565–66)  Hill contends that counsel should have objected to this testimony as impermissible "hearsay." (Doc. 10 at 53)  Also, Hill complains that when he testified at trial, counsel did not "allow[ ] [him] the same freedom to say what his [neighbor] said [during] the same conversation."  (Doc. 10 at 54)

The post-conviction court correctly concluded that any hearsay objection to the neighbor's testimony would have been "meritless." (Respondent's Exhibit 9 at 10)  The neighbor, a state witness, testified to what Hill told him.  "An admission

of a party opponent is admissible as an exception to the hearsay evidence rule."

*Morris v. State*, 233 So. 3d 438, 446 (Fla. 2018).  Thus, "[w]hen offered by the state, a

defendant's out-of-court statement falls under the admission exception to the rule

against hearsay — it is offered 'against' the defendant and is his own statement."

*Carter v. State*, 226 So. 3d 268, 271 (Fla. 4th DCA 2017).  The neighbor's testimony

about Hill's statements was admissible under this hearsay exception.  Counsel was

not deficient for failing to raise Hill's meritless objection.  *See Freeman*, 536 F.3d

at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim.").

The post-conviction court did not address the other component of Hill's claim

— counsel's refusal to allow Hill to testify to what his neighbor said during the

conversation.  (Respondent's Exhibit 9 at 10)  Therefore, this allegation is subject to

*de novo* review.  *See Johnson v. Williams*, 568 U.S. 289, 303 (2013) ("When the

evidence leads very clearly to the conclusion that a federal claim was inadvertently

overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered

opportunity to make his case before a federal judge.").

Even so, Hill is entitled to no relief because he cannot show prejudice.

Counsel allowed Hill to give his version of what he said to the neighbor

(Respondent's Exhibit 18 at 1966):

> I was dirty.  I was covered in dust, concrete dust, and I
> had two of my guys with me and I had made a comment
> to him that said times are getting tough with this economy,
> so tough that I'm having to get dirty.  The boss is having to
> get dirty now.  It was a joke.  I didn't mean nothing [ ] by
> it.  I wasn't insinuating that I was having trouble paying
> my bills.  I was just making a joke.  You know what I

                        mean?  Because I was covered from head to toe in dirt.
                        That was it.

Moreover, Hill expressly denied "making a statement . . . about wanting commit

some robberies."  (Respondent's Exhibit 18 at 1965)  Hill does not explain how

additional testimony about what his neighbor said would have advanced his defense.

Nor does he show that such testimony would have been admissible under a hearsay

exception.  Unlike Hill, the neighbor was not a party opponent.  Thus, Hill cannot

show "a reasonable probability that, but for counsel's [failure to elicit testimony

about the neighbor's statements], the outcome at trial would have been different."

*Reed*, 767 F.3d at 1261.

**Ground Nine:**

      Hill faults trial counsel for not objecting to Rowland's allegedly inadmissible

"hearsay."  (Doc. 10 at 56)  As noted above, Rowland testified about statements Hill

made to him, including Hill's admission that he "shot [a man] in the f*cking back."

(Respondent's Exhibit 18 at 1352)  The post-conviction court correctly held that any

hearsay objection would have failed.  (Respondent's Exhibit 9 at 12)  Rowland was a

state witness.  Therefore, his testimony about Hill's statements was admissible under

the party-opponent exception to the hearsay rule.  *See Carter*, 226 So. 3d at 271

("When offered by the state, a defendant's out-of-court statement falls under the

admission exception to the rule against hearsay — it is offered 'against' the defendant

and is his own statement.").  Counsel was not deficient for failing to raise Hill's

meritless hearsay objection.

Also, Hill contends that trial counsel provided ineffective assistance by denying him the "freedom" to offer "hearsay" testimony about what Rowland said during their conversations. (Doc. 10 at 56) Because the post-conviction court failed to address this assertion, *de novo* review applies. *See Johnson*, 568 U.S. at 303 ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge.").

Even under *de novo* review, Hill is entitled to no relief because he cannot show that counsel's performance was deficient. Unlike Hill, Rowland was not a party opponent. Hill fails to establish that any other hearsay exception would have applied to Rowland's out-of-court statements. Moreover, Hill neither describes those statements nor explains how they would have aided his defense. Thus, Hill cannot show that "no competent counsel would have" refrained from eliciting testimony about Rowland's statements. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).

**Ground Ten:**

Lastly, Hill contends that the "cumulative effect" of counsel's alleged errors "deprived [him] of his right to a fair trial. (Doc. 10 at 59) "Under the cumulative error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative error claim "must fail," however, where none of the "individual claims

of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of error lacks merit, Hill cannot show cumulative prejudicial effect.

## IV. CONCLUSION

Hill's amended application for the writ of habeas corpus (Doc. 10) is **DENIED**. The clerk must enter a judgment against Hill and **CLOSE** this case.

### CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Hill fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate both the merits of the grounds and the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Hill must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on May 27, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE